**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                                                          CAUSE NO. 3:12-CR-115-CWR-FKB-1

MICHAEL DEWAYNE HUNT                                                     DEFENDANT

**ORDER**

      Before the Court is Michael Dewayne Hunt's renewed motion for compassionate release. Docket No. 146. The Court has reviewed the presentence report, sentencing transcripts, and briefs. For the reasons that follow, the motion is granted.

**I.      Background**

      In 2012, Michael Hunt was indicted on charges related to possession and distribution of methamphetamine. He ultimately pleaded guilty to conspiracy to possess with intent to distribute more than five grams of methamphetamine in violation of 21 U.S.C. § 846. Docket No. 55. In 2013, Hunt was sentenced to 160 months of incarceration followed by four years of supervised release, and ordered to pay restitution in the amount of $4,700. Docket No. 73. In 2016, his sentence was reduced to 128 months when the Guidelines range for his crime was reduced and made retroactive. Docket No. 99.

      In a letter dated May 11, 2020, Hunt petitioned the Court for compassionate release in light of the ongoing COVID-19 pandemic. He writes that he is 47 and suffers from Type II diabetes, hypertension, and high cholesterol. Docket No. 139 at 2. Hunt is currently serving his sentence at the Bureau of Prisons (BOP) low-security facility in Texarkana, Texas (FCI Texarkana). According to Hunt's letter, he lives with five inmates in a small cell, so he cannot practice social distancing. Hunt says the TV rooms contain at least 100 inmates at a time, giving further

opportunity for the virus to spread. FCI Texarkana apparently provides inmates with only one knitted mask per week for protection. *Id.* at 1. At the time he wrote, Hunt states that the institution had not tested any of the inmates for COVID-19.

Hunt claims to have been a model prisoner with no disciplinary record, and to have "taken many educational courses." Docket No. 144 at 16. In his motion for reduction of sentence in 2014, he claimed to receive good work reports from his supervisors. Docket No. 88 at 3. The BOP website shows his scheduled release date as December 15, 2021.

This Court could not have predicted years ago when it sentenced Hunt that 2020 would bring a global pandemic to our shores. In less than a year, the virus known as COVID-19 has now killed more than 315,000 Americans. *See* Centers for Disease Control, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Dec. 22, 2020). Within the federal prison system, 168 inmates and two staff members are known to have died from COVID-19. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed Dec. 21, 2020).[1]

The BOP says it has implemented a plan to minimize the spread of the virus into and inside its prisons, which includes suspensions of social visits, legal visits, inmate movements, and

---

[1] The devastating impact that COVID-19 has had within the country's prisons is reflected in this data: "By Dec. 15, at least 276,235 people in prison had tested positive for the illness, a 10 percent increase from the week before." The Marshall Project, *A State-by-State Look at Coronavirus in Prisons* (updated Dec. 18, 2020), https://www.the marshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last accessed Dec. 22, 2020). According to this report, 1,738 prisoners (of which 175 were federal prisoners) have died from the virus. *Id*. A commission co-chaired by former Attorneys General Loretta Lynch and Alberto Gonzalez recently released an interim report discussing the enormous challenges correctional facilities face because of the coronavirus pandemic. "The most difficult of these is enabling people to maintain safe physical distance in shared spaces, that are smaller, on average, than cruise ship cabins or shared bedrooms in nursing homes," the report noted. National Commission on COVID-19 and Criminal Justice, Sector-Specific Recommendations: Corrections, https://counciloncj.foleon.com/covid19/report/corrections/ (last accessed Dec. 22, 2020). "Incarcerated individuals are also more likely to suffer from chronic health conditions, such as heart disease or diabetes, which can exacerbate the impact of the disease. Other challenges included limited medical resources as well as a daily churn of staff members, visitors, and newly admitted individuals." *Id*. Moreover, the Commission notes that the rate of COVID-19 cases in state and federal prisons is 4.3 times higher than the overall U.S. rate and the COVID-19 mortality rate in prison is 2.1 times that of the general population. *Id*.

increased social distancing for inmates where possible. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Dec. 21, 2020). These restrictions, however, do not mention any testing of staff members, who are at high risk of contracting COVID-19 due to its rapid spread.

Nothing has been placed in the record showing the testing regimen at FCI Texarkana. As of this writing, public information shows that 176 out of 1017 inmates at FCI Texarkana have active COVID-19 infections. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed December 21, 2020)

## II.  Legal Standard

Hunt requests relief under the compassionate release provision of 18 U.S.C § 3582. According to the relevant part of the statute, a court may reduce a defendant's term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after . . . the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility . . . ." 18 U.S.C. § 3582(c)(1)(A). The Court must "find[] that extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The Court must "also consider[] the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable." *Id*.

## III.  Discussion

### A.  Exhaustion

Although this Court denied without prejudice Hunt's first motion for compassionate release for failure to exhaust, *see* Docket No. 145, Hunt's renewed motion shows that he requested compassionate release from the warden and was neither granted nor denied, *see* Docket No. 146-

1. More than 30 days elapsed from that request before he renewed his motion. Accordingly, Hunt has now exhausted his administrative remedies.

### B. Extraordinary and Compelling Reasons

The government argues that Hunt's motion does not present extraordinary and compelling reasons for compassionate release, and that the applicable policy statement, U.S.S.G. § 1B1.13, provides no basis for a sentence reduction based on COVID-19. The portion of § 1B1.13 to which the government points describes only four kinds of "extraordinary and compelling reasons": (1) a terminal illness or medical condition that "substantially diminishes" the ability of the defendant to provide care for themselves in a correctional facility, and from which he will not recover, (2) a defendant who is at least 65 years old and is "experiencing a serious deterioration" due to the aging process, and has served at least 10 years or 75 percent of his sentence, whichever is less, (3) a defendant who has minor children or an incapacitated spouse with no caregiver, or (4) another extraordinary or compelling reason "[a]s determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13, comment (n.1).

Hunt's circumstances do not fall into one of these categories. But this Court has already held that the discrepancy between the Sentencing Commission's policy statements and Congress's amendment to § 3582(c)(1)(A) means that "the Sentencing Commission does not have a policy position applicable to motions for compassionate release filed by defendants pursuant to the First Step Act." *United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at \*7 (S.D. Miss. May 1, 2020). The Court concluded, consistent with many other courts to have ruled on this issue, that district courts have the "discretion to determine what constitutes an 'extraordinary and compelling reason []' on a case by case basis." *Id*. (citation omitted).

There are extraordinary and compelling reasons to consider compassionate release in this particular case. As the government notes, COVID-19 poses significant risks to persons like Hunt who have Type 2 diabetes and hypertension. Docket No. 140 at 2-3 (citing CDC guidance); *see also* Centers for Disease Control, *People with Certain Medical Conditions*, Coronavirus Disease 2019, (updated Dec. 1, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Those risks have grown more concerning over the course of the year. In October 2020, The Lancet wrote that "growing epidemiological data have revealed [patients with diabetes] are at higher risk of severe clinical outcomes of COVID-19." *COVID-19 and Diabetes: A Co-Conspiracy?*, 8 The Lancet Diabetes & Endocrinology 801 (Oct. 1, 2020), https://www.thelancet.com/journals/landia/article/PIIS2213-8587(20)30315-6/fulltext. Stat summarized the data as "alarming": "After accounting for potentially relevant risk factors such as social deprivation, ethnicity, and other chronic medical conditions, the risk of dying from Covid-19 was still almost three times higher for people with type 1 diabetes and almost twice as high for type 2, versus those without diabetes." Elizabeth Cooney, *Why People With Diabetes are Being hit so Hard by Covid-19*, Stat (Oct. 1, 2020), https://www.statnews.com/2020/10/01/why-people-with-diabetes-are-being-hit-so-hard-by-covid-19/. For people under 65—like Hunt—half of COVID deaths are linked to diabetes. *Id.*[2]

To this, the government points to an emergency plan to claim that Hunt "has not shown that the BOP is incapable of managing the [COVID-19] situation" so that his release would be

---

[2] *See also* World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 24, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; Brian Mastroianni, *Risk of Death from COVID-19 Four Times Greater for Those with Diabetes*, Healthline (April 23, 2020) https://www.healthline.com/health-news/covid-19-impact-on-diabetes-hospitalizations.

warranted. Docket No. 140 at 7. It states that the plan was implemented in March 2020 "to minimize the risk of COVID-19 transmission into and inside its facilities."

While the government should be recognized for implementing these protective measures, its argument that the BOP can "manag[e] the situation" with this generalized plan is not borne out by the data. BOP has seen more than 38,721 confirmed COVID infections among BOP inmates and staff. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed Dec. 21, 2020) ("There are 5,994 federal inmates and 1,676 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 28,414 inmates and 2,637 staff have recovered."). Given a population of 138,198 inmates, *see id.*, approximately 25% of all BOP inmates have had COVID. That far exceeds the approximate 5.5% rate that the entire United States population has seen.[3]

One part of BOP's plan jumps out. In contrast to its detailed guidance for testing inmates, the modified operations plan does not describe any testing of BOP staff, instead choosing to do "temperature checks" and "screening." But that is almost a plan to *not* detect COVID cases, since "[p]reliminary research indicates that undocumented cases of coronavirus, including those of people who have not yet begun to show symptoms are responsible for a significant portion of the virus's transmission." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 404 (E.D. Pa. 2020) (citations omitted).[4]

---

[3] Publicly-available data indicates that the United States has experienced 17.9 million infections against a population of 328.2 million residents.

[4] Not all BOP facilities have followed BOP's directives. *See* Clare Hymes, *Federal Prison Didn't Isolate Inmates who Tested Positive for Coronavirus, Report Finds*, CBS News (Nov. 17, 2020) ("[A]ccording to a new report from the Justice Department's inspector general, . . . FCI Oakdale did not comply with federal health guidance from the Bureau of Prisons and CDC. . . . Some inmates who tested positive were left in their housing units for up to six days without being isolated, the report said, and staff who supervised these inmates were not given proper personal protective equipment.").

Moreover, the specific living facilities that Hunt describes in his letter, with five inmates sharing each cell, make it impossible to meet the CDC's social distancing guidelines. Docket No. 139 at 1. Hunt states that the TV rooms at his facility contain "at least 100 inmates . . . at [a] time", a number which exceeds the persons Texas has allowed to gather in *outside* spaces, unless specifically permitted by a Mayor or County Judge. *Compare id. with* Tex. Exec. Order No. GA-28 at 3 (June 26, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-28_targeted_response _to_reopening_COVID-19.pdf.

Hunt's concerns fairly reflect the greatly increased risk of death or hospitalization that he will face if he contracts the virus. It is not clear why a person with these risky health conditions, mere months left to serve, and a dangerous living situation should be required to serve the remainder of his sentence.

This Court previously joined "many of its sister courts in finding that, in circumstances such as [Hunt's], the combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19 constitute an extraordinary and compelling reason' supporting release." *United States v. Mason*, No. 3:17-CR-104-CWR-LRA-3, 2020 WL 3065303, at *2 (S.D. Miss. June 9, 2020) (citations and quotations omitted).[5] Given the

---

[5] *See, e.g.*, *United States v. Bass*, 462 F. Supp. 3d 176, 186 (N.D.N.Y. 2020) (finding "extraordinary and compelling reason" based on defendant's "health conditions and dire circumstances at FCI Elkton"); *United States v. Foreman*, No. 19-CR-62, 2020 WL 2315908, at *2-4 (D. Conn. May 11, 2020) (finding "extraordinary and compelling reason" based on defendant's hypertension and age in combination with conditions at FCI Danbury); *United States v. Jenkins*, 460 F. Supp. 3d 1121, 1128 (D. Colo. 2020); *United States v. Pena*, 459 F. Supp. 3d 544, 549-50 (S.D.N.Y. 2020) (finding "extraordinary and compelling reason" based on defendant's hypertension and hyperlipidemia and the presence of 43 confirmed COVID-19 cases at "the most heavily populated BOP facility"); *United States v. Soto*, No. 18-CR-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020) (finding "extraordinary and compelling reason" based on defendant's hypertension and 27 reported staff infections at his facility); *United States v. Scparta*, --- F. Supp. 3d ---, 2020 WL 1910481, at *2 (S.D.N.Y. Apr. 20, 2020) (finding "extraordinary and compelling reason" based on defendant's hypertension, age, and "shocking" conditions at FCI Butner, which had 65 infected inmates); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020) (finding "extraordinary and compelling reason" based on defendant's hypertension and conditions at FCI Danbury); *Rodriguez*, 451 F. Supp. 3d at 400-04 (finding "extraordinary and compelling reason" based on defendant's diabetes, high blood pressure, and liver abnormalities, the outbreak at FCI Elkton, and the short period remaining on his sentence).

facts above, this Court concludes that extraordinary and compelling reasons support Hunt's motion for compassionate release.

### C. Safety to Others and the Community

A defendant seeking compassionate release must also demonstrate that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13. "Section 3142(g) requires the court to consider factors such as the nature and circumstances of the charged offense, the history and characteristic[s] of the defendant, and the nature of seriousness of the danger to a person or the community at large posed by the defendant's release." *United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322, at *3 (E.D. La. Apr. 2, 2020) (citing 18 U.S.C. § 3142(g)).

In this case, Hunt pleaded guilty to one count of conspiracy to possess with intent to distribute. Hunt's sentence is for a serious crime, one for which the Court imposed a significant sentence of 160 months followed by four years of supervised release. Docket No. 81 at 54-55. This was later reduced to 128 months based on a subsequent Guidelines reduction. Docket No. 99. The crime to which Hunt pled was not a crime of violence, though, and his PSR deemed there to be no identifiable victims. Docket No. 70 at 8.

Hunt had a list of prior convictions in his PSR as well, resulting in a criminal history category of III.[6] Docket No. 81 at 46. The convictions and arrests in his criminal history were committed over a decade ago, with the exception of dismissed charges related to an expired tag and a suspended driver's license from 2012. Docket No. 70 at 10-13. While his criminal history is long, Hunt has received no disciplinary infractions since being incarcerated in November of 2012.

---

[6] This includes a total of four convictions and eight arrests. The majority are drug possession charges and driving violations, but there also is a 1993 conviction for shooting into an occupied building when Hunt was 20 years old, as well as a 1997 arrest for assault that did not result in a conviction. Docket No. 70 at 10-13.

8

Docket No. 139 at 2; Docket No. 144 at 16. Additionally, Hunt claims to have availed himself of many educational programs. *Id.*

The Sentencing Commission has stated that "[o]lder offenders [are] substantially less likely than younger offenders to recidivate following release. [R]ecidivism measured by rearrest, reconviction, and reincarceration declined as age increased." U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Dec. 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf. At the age of 47, Hunt would be less likely to recidivate than younger offenders.

Hunt's reply states that he would be no danger to the public, and the government has made no argument otherwise. Based on the facts above, the Court concludes that Hunt would not be a danger to the community. *See United States v. Arroyo*, No. EP-6-CR-479-PRM-1, 2020 WL 3512964, at *4 (W.D. Tex. June 23, 2020) (granting petition for early release where career offender's participation in rehabilitation programs, disciplinary record, age, and medical condition made it less likely he would re-offend, and would no longer be a danger to the community).

### D.     Section 3553(a) Factors

"Section 3553(a) requires a court to consider . . . certain factors when imposing a sentence, including the nature and circumstances of the offense and history and characteristics of the defendant, the need for the sentence, and the variety of sentences available." *Perdigao*, 2020 WL 1672322, at *4. Because this Court sentenced Hunt, it "is intimately familiar with how these factors apply to his circumstances." *United States v. Scparta*, --- F. Supp. 3d ---, 2020 WL 1910481, at *8 (S.D.N.Y. Apr. 20, 2020). In evaluating these factors the Court must pay particular attention to the purpose of imposing the sentence. 18 U.S.C. § 3553(a).

Hunt's projected release date is less than a year away. With regard to the need for the sentence imposed, one has to ask what more could be accomplished by incarcerating this middle-aged man with these health conditions for another year in this environment. The purpose of his sentence has been fulfilled, while the risk of serious illness or death is high if he were to remain. The Court has considered the § 3553(a) factors in light of the extraordinary circumstances created by the COVID-19 pandemic. Balancing the risks against the short time left to serve, the Court concludes that compassionate release is warranted in his case.

### E. Release Plan

The government has requested a 14-day quarantine for Hunt. In light of the rapid spread of the virus in prisons, the Court believes that the safer course of action would be for Mr. Hunt to quarantine in the residence pre-approved earlier this year by the U.S. Probation Office. *E.g.*, *Kelly*, 2020 WL 2104241, at *9. Upon release, he shall self-quarantine for 14 days and comply with all state and local regulations regarding COVID-19 safety measures. The defendant shall reside at a location approved by the Probation Office, with transportation there to be arranged in consultation with Mr. Hunt's counsel.

## IV. Conclusion

For the reasons stated above, Hunt's motion for compassionate release is granted. This Court resentences Hunt to time served. His four-year term of supervised release shall commence immediately upon release from incarceration. This term of supervision is subject to all of the conditions in the original judgment, with the additional condition that upon release from BOP custody, Hunt shall self-quarantine for 14 days.

**SO ORDERED**, this the 22nd day of December, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE